## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## (JACKSONVILLE DIVISION)

Walgreen Co., Conopco, Inc., Ingersoll-Rand
Company, and Del Monte Corporation,

            Plaintiffs,

vs.

Sea Star Line, LLC and Saltchuk Resources,
Inc.,

            Defendants.

_____/

Civil Action No: 3: 12-CV-1182-J-25JRK

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Walgreen Co., Conopco, Inc., Ingersoll-Rand Company, and Del Monte
Corporation (individually and collectively "Plaintiffs") sue Sea Star Line, LLC and Saltchuk
Resources, Inc., (individually and collectively "Defendants") and allege as follows:

### NATURE OF ACTION

1.     This lawsuit concerns a brazen cartel (or conspiracy) among Defendants and
their co-conspirators to eliminate competition in the market for ocean freight services between
the United States and Puerto Rico in violation of the antitrust laws of the United States.  As
more fully alleged below, from at least as early as April 2002 and continuing until at least April
2008, Defendants and their co-conspirators engaged in a conspiracy not to compete on the sale
of Puerto Rican Cabotage services (as defined below) in order to overcharge Plaintiffs and
others for Puerto Rican Cabotage services in *per se* violation of Section 1 of the Sherman Act,
15 U.S.C. § 1.  Defendants and their co-conspirators engaged in this conspiracy by, among
other anticompetitive acts, restricting capacity, fixing shipping rates, instituting and fixing the
amounts of various surcharges in addition to shipping rates, rigging bids to customers, and/or

KENNY NACHWALTER, P.A.

allocating customers.  As a result of their unlawful conduct, Defendants are jointly and severally liable to Plaintiffs for all of the damages sustained by Plaintiffs as a result of the conspiracy.

2.      The allegations in this Complaint are pled in the alternative if necessary to avoid inconsistency.

## JURISDICTION AND VENUE

3.      Plaintiffs' civil antitrust claims arise under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

4.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1337.

5.      Venue is proper in this Court pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 & 22, and 28 U.S.C. § 1391, for any one or more of the reasons stated in the subparagraphs below.

A.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this District, including the following:

(1)      Defendant Sea Star Line LLC ("Sea Star Line") maintained its principal place of business in Jacksonville throughout the conspiracy, and still maintains its principal place of business in Jacksonville today;

(2)      Officers, employees, and representatives of Sea Star Line who carried out the conspiracy were based in Jacksonville during the conspiracy.  These individuals included Frank Peake, who served as President and COO of Sea Star Line; Peter Baci, who served as Senior Vice President/Yield Management of Sea Star Line; Alexander Chisholm, who served as Assistant Vice President/Yield Management of Sea Star Line; and Phil Bates, who served as Senior Vice President/International Services of Sea Star Line.

2

KENNY NACHWALTER, P.A.

(3)      The officers, employees, and representatives of Sea Star Line who carried out the conspiracy had in-person meetings with co-conspirators in this District in furtherance of the conspiracy. The Sea Star Line officers, employees and representatives who participated in the conspiracy also routinely communicated by telephone, fax, and email from Jacksonville with co-conspirators in furtherance of the conspiracy;

(4)      Officers, employees, and representatives of Defendant Saltchuk Resources, Inc. ("Saltchuk"), including Leonard Shapiro, Mark Tabbutt, and Bob Magee, regularly came to Jacksonville during the conspiracy period to meet with Sea Star Line personnel as part of Saltchuk's overall control of all material management, financial, and strategic and operational decisions for Sea Star Line.

(5)      Officers, employees, and representatives of Saltchuk, including Leonard Shapiro, Mark Tabbutt, and Bob Magee, carried out acts in furtherance of the conspiracy in or near Jacksonville, including in-person discussions with co-conspirators;

(6)      Co-conspirators Crowley Liner Services and Crowley Maritime Corporation (collectively, "Crowley") maintained their respective principal places of business in Jacksonville during the conspiracy, and both still maintain their respective principal places of business in Jacksonville today. Officers, employees and representatives of Crowley who carried out the conspiracy were based in Jacksonville during the conspiracy.

(7)      The officers, employees, and representatives of Crowley who carried out the conspiracy had in-person meetings with co-conspirators in Jacksonville in furtherance of the conspiracy. The Crowley officers, employees, and representatives who participated in the conspiracy also routinely communicated by telephone, fax, and email from Jacksonville with co-conspirators in furtherance of the conspiracy;

KENNY NACHWALTER, P.A.

(8)     The officers, employees, and representatives of co-conspirator Horizon who carried out the conspiracy, including Gabriel Serra, Kevin Gill, and Greg Glova, routinely communicated in furtherance of the conspiracy by telephone, email, and fax with Sea Star Line personnel who were based in Jacksonville, including Frank Peake and Peter Baci. The Horizon officers, employees, and representatives who participated in the conspiracy also routinely communicated in furtherance of the conspiracy by telephone with Crowley personnel who were based in Jacksonville;

(9)     Defendant Sea Star Line provided Puerto Rican Cabotage services between Jacksonville and Puerto Rico during the conspiracy and continues to do so today. Sea Star Line has terminal, warehousing, and sales operations in Jacksonville;

(10)     Co-conspirators Horizon and Crowley both provided Puerto Rican Cabotage services between Jacksonville and Puerto Rico during the conspiracy and continue to do so today. Horizon and Crowley also each have terminal, warehousing, and sales operations in Jacksonville;

(11)     Defendants targeted trade in Jacksonville as part of their conspiracy. For example, on April 24, 2002, Defendants, including Leonard Shapiro of Saltchuk, and Peter Baci and Phil Bates of Sea Star Line, reached an agreement with Gabriel Serra, Kevin Gill, and others from Horizon to limit the number of sailing per week between Puerto Rico and Jacksonville, among other ports in the Continental United States. In addition, on June 26, 2003, Leonard Shapiro of Saltchuk and Gabriel Serra of Horizon agreed to a 50/50 allocation of containership volume between Sea Star and Horizon, which included Puerto Rican Cabotage services involving the port of Jacksonville. As a result of their conspiracy, Defendants and their co-conspirators artificially and unlawfully increased the rates and surcharges on Puerto Rican

Cabotage services originating in Jacksonville, passing through the port of Jacksonville, or arriving in Jacksonville; and

(12)     The Department of Justice's criminal antitrust investigation and prosecutions focused on Jacksonville. Each of the five individuals who have pled guilty for their involvement in the conspiracy entered their pleas and was sentenced in proceedings in the Middle District of Florida's Jacksonville Division.

(13)     Several specific overt acts in furtherance of the conspiracy occurred in the Middle District of Florida, including, for example:

(a)     Sea Star Line's Peter Baci and Alexander Chisholm were at Sea Star's offices in Jacksonville when they executed their scheme with co-conspirators Horizon and Crowley to rig bids for Walgreen's online auctions to award its Puerto Rican Cabotage business in 2007 and 2008. During this auction, Messrs. Baci and Chisholm communicated by telephone from Jacksonville with co-conspirators from Horizon and Crowley to discuss their bidding strategies as the auction was occurring in order to submit pre-arranged complementary bids to ensure that, despite the auction, Walgreen would receive an artificially high price;

(b)     Sea Star Line's Peter Baci prepared at Sea Star Line's offices in Jacksonville lists of customers whose contracts were soon to expire in order to focus upcoming discussions with co-conspirators on unlawfully coordinating those customers' pricing in upcoming contracts. Those lists included Plaintiffs. For example, on or about August 17, 2007, Mr. Baci sent Greg Glova of Horizon a list of customers whose contracts were soon to expire that included Plaintiffs Unilever, Del Monte, and Ingersoll-Rand;

KENNY NACHWALTER, P.A.

(c)     Sea Star Line's Peter Baci met with Horizon's Kevin Gill and/or Greg Glova at the Hyatt Airport Hotel in Orlando, Florida in 2005 to discuss various aspects of the conspiracy, including pricing and profits plans;

(d)     On or about October 26, 2005, Saltchuk's Mark Tabbutt and Bob Magee met with executives from co-conspirator Horizon during the Puerto Rico Summit at the World Golf Village in St. Augustine, Florida to discuss and agree upon an extension of a capacity sharing agreement between Horizon and Sea Star. There was an earlier Puerto Rico Summit in 2003, also at the World Golf Village in St. Augustine, which all four Puerto Rico carriers attended and where Mr. Magee made a presentation urging the carriers to increase rates by 50%.

(e)     Sea Star Line's Frank Peake and Peter Baci met with Horizon's Gabriel Serra and Greg Glova in Orlando, Florida in August 2006 to discuss various aspects of the conspiracy, including how their agreements on allocating customers and market share applied to shipments of refrigerated containers;

(f)     Sea Star Line's Frank Peake and Peter Baci met with Horizon's Gabriel Serra and Greg Glova on October 24, 2006 at the Hyatt Airport Hotel in Orlando, Florida to discuss various aspects of the conspiracy, including to exchange and discuss lists of customers that they had agreed to allocate;

(g)     Sea Star Line's Frank Peake and Peter Baci met with Horizon's Gabriel Serra and Greg Glova in Orlando, Florida in December 2006 to discuss various aspects of the conspiracy, including Sea Star Line's pricing and profit plan for 2007 and the capacity sharing agreement between Sea Star and Horizon;

KENNY NACHWALTER, P.A.

(h)     Sea Star Line's Peter Baci met with Horizon's Kevin Gill and/or Greg Glova at the World Golf Village in St. Augustine, Florida in September 2007 to discuss various aspects of the conspiracy, including pricing and profit plans;

(i)     Sea Star Line's Frank Peake and Peter Baci met with Horizon's Gabriel Serra and Greg Glova in Orlando, Florida on February 20, 2008 to discuss various aspects of the conspiracy; and

(j)     Defendants engaged in activities in this District to fraudulently conceal their conspiracy.  For example and without limitation, Sea Star Line's Alexander Chisholm initially destroyed a computer hard drive containing incriminating documents in Jacksonville.  Likewise, Peter Baci of Sea Star Line sent and received emails in furtherance of the conspiracy in Jacksonville using an anonymous Google mail account to avoid detection from others.

B.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because each Defendant is subject to personal jurisdiction in this District;

C.     Venue is proper in this District pursuant to 15 U.S.C. § 22 because Defendants transact business or are found in this District;

D.     To the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is found in this District; and

E.     Defendant Sea Star Line has already publicly acknowledged that venue is proper in this District.

6.     Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated in the subparagraphs below.

      A.      Defendants are amenable to service of process because each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process;

      B.      Defendants are amenable to service of process because they are engaged in substantial and not isolated activity in Florida; they operate, conduct, engage in, or carry on a business or business venture in Florida or have agents who operate, conduct, engage in, or carry on a business or business venture on their behalf in furtherance of the conspiracy in Florida; and they contract to supply Puerto Rican Cabotage services, or have agents who contract to supply Puerto Rican Cabotage services in Florida;

      C.      Defendants are amenable to service of process because each belonged to the conspiracy alleged in the Complaint and each Defendant committed tortious and unlawful acts in furtherance of the conspiracy in Florida and in this District, including, without limitation, engaging in the anticompetitive conduct described in Paragraph 5 above, and selling Puerto Rican Cabotage services in Florida and in the District at artificially inflated prices;

      D.      Defendants are amenable to service of process because each belonged to the conspiracy alleged in the Complaint and Defendants' co-conspirators committed tortious and unlawful acts in furtherance of the conspiracy in Florida and in this District, including, without limitation, engaging in the anticompetitive conduct described in Paragraph 5 above, and selling Puerto Rican Cabotage services in Florida and in the District at artificially inflated prices;

      E.      Jurisdiction in this District is proper for Defendant Sea Star Line because of the tortious acts of its officers, directors and agents in furtherance of the conspiracy within this District and in Florida as alleged herein, and the tortious acts of is co-conspirators in furtherance of the conspiracy within this District and in Florida.  Further, Sea Star Line is headquartered and maintains its principal place of business in Jacksonville, Florida.

KENNY NACHWALTER, P.A.

F.      Jurisdiction in this District is proper for Defendant Saltchuk because of the acts of its officers, directors and agents in furtherance of the conspiracy within this District and in Florida as alleged herein, and the tortious acts of its co-conspirators in furtherance of the conspiracy within this District and in Florida.   In addition, the acts of Sea Star Line are attributable to Saltchuk for jurisdiction purposes because Saltchuk made or controlled all material management, financial, strategic, and operational decisions for Sea Star Line, Sea Star Line is Saltchuk's agent and alter ego, and Saltchuk and Sea Star Line effectively functioned together as a single entity.   By way of example, Saltchuk's control over Sea Star Line's operations included the following:

(1)      Saltchuk controlled the Sea Star Line Board of Directors and selected, appointed, and terminated all executive-personnel at Sea Star Line, and was directly involved in determining their compensation;

(2)      Saltchuk was directly involved in budgeting for Sea Star Line, and in particular, budgeting for capital expenditures;

(3)      Saltchuk was directly involved in and controlled strategic planning for Sea Star Line;

(4)      Saltchuk provided the funds for all major Sea Star Line capital expenditures;

(5)      Saltchuk provided guarantees for loans and other financing and credit that third parties extended to Sea Star Line;

(6)      Saltchuk decided whether to sell Sea Star Line, including to reject Horizon's 2007 offer to buy Sea Star Line;

KENNY NACHWALTER, P.A.

(7)     Saltchuk has received dividends and distributions from Sea Star Line, and, as directed by Saltchuk, prior to January 1, 2007, Sea Star Line tax losses or gains were passed through to Saltchuk;

(8)     Saltchuk directed Sea Star Line to contract with other Saltchuk affiliates for ship management, marine terminal and stevedoring services;

(9)     Saltchuk dictated certain aspects of Sea Star Line's pricing, including how Sea Star Line provided volume discounts to customers;

(10)     Saltchuk directed that another Saltchuk-owned company, Totem Ocean Trailer Express, make approximately ten of its employees available to take positions at Sea Star Line for several months starting in 2002 to assist Sea Star Line with operational problems stemming from its attempts to integrate certain assets that Sea Star Line had acquired from another carrier in the Puerto Rican trade that had gone bankrupt. Sea Star Line had acquired these assets as determined by Saltchuk and with funds provided by Saltchuk.

(11)     In or about February 2004, Saltchuk directed Sea Star Line's Peter Baci to compile detailed market share data for the Puerto Rico route, including data on containerships versus barges and Sea Star Line versus Horizon, for a meeting with Saltchuk;

(12)     During an April 2004 Sea Star Line quarterly management review meeting, Bob Magee of Saltchuk discussed Saltchuk's corporate philosophy with Sea Star Line management and said that Sea Star Line needed to increase its rates by at least 20%; and

(13)     Saltchuk personnel, including Leonard Shapiro, Mark Tabbutt, and Bob Magee, regularly came to Sea Star Line's office in Jacksonville and spent considerable time working with Sea Star Line employees to assist with financial, operating, and sales and marketing activities. As part of these ongoing Saltchuk contacts with this District, Leonard Shapiro participated in a Sea Star Line sales and marketing meeting with a large customer,

Caribbean Shipping, and provided his business card to the customer that identified Shapiro as "Principal, Director" for Saltchuk Resources, Inc.

G.    Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the Florida long-arm statute because each Defendant has operated, conducted, engaged in, or carried on a business or business venture in Florida and because Florida's long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the State to satisfy due process.

## PARTIES

### Plaintiffs

7.    Plaintiff Walgreen Co. ("Walgreen") is an Illinois corporation with its principal place of business in Deerfield, Illinois. During the time period relevant to the allegations in this Complaint, Walgreen directly purchased Puerto Rican Cabotage services from one or more Defendants and their co-conspirators and paid artificially high prices for Puerto Rican Cabotage services because of Defendants' and their co-conspirators' anticompetitive conduct.

8.    Plaintiff Conopco, Inc. ("Conopco") is a New York corporation with its principal place of business in Englewood Cliffs, New Jersey. During the time period relevant to the allegations in this Complaint, Conopco directly purchased Puerto Rican Cabotage services from one or more Defendants and their co-conspirators and paid artificially high prices for Puerto Rican Cabotage services because of Defendants' and their co-conspirators' anticompetitive conduct.

9.    Ingersoll-Rand Company ("Ingersoll-Rand") is a New Jersey corporation with its principal place of business in Piscataway, New Jersey. Ingersoll-Rand brings this action on its own behalf and on behalf of its affiliated assignors, including Thermo King Corporation and

Trane U.S. Inc. (formerly known as American Standard Inc.).  The reference in this Complaint to "Ingersoll-Rand" includes its assignors.  During the time period relevant to the allegations in this Complaint, Ingersoll-Rand directly purchased Puerto Rican Cabotage services from one or more Defendants and their co-conspirators and paid artificially high prices for Puerto Rican Cabotage services because of Defendants' and their co-conspirators' anticompetitive conduct.

10.     Del Monte Corporation ("Del Monte") is a Delaware corporation with its principal place of business in San Francisco, California.  During the time period relevant to the allegations in this Complaint, Del Monte purchased Puerto Rican Cabotage services from one or more Defendants and their co-conspirators and paid artificially high prices for Puerto Rican Cabotage services because of Defendants' and their co-conspirators' anticompetitive conduct.

11.     Each Plaintiff is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.  During the time period relevant to the allegations in this Complaint, Plaintiffs directly purchased in the United States Puerto Rican Cabotage services from Defendants and their co-conspirators, and Plaintiffs' injury and damages proximately arise from the conspiracy overcharges in those direct purchases.

12.     Each Plaintiff directly purchased Puerto Rican Cabotage services from Defendants and/or their co-conspirators during the conspiracy period.  Plaintiffs' purchases of Puerto Rican Cabotage Services were made pursuant to confidential contracts entered into with Defendants and/or their co-conspirators under § 14101(b) of the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 14101(b).  As provided for by § 14101(b)(1) of the ICCTA, these contracts expressly waived Plaintiffs' rights and remedies under Section B of the ICCTA, including their right to file complaints with the Surface Transportation Board ("STB").  Sea Star's contracts with Plaintiffs provided as follows:

> Pursuant to 49 U.S.C. § 14101(b), CARRIER and SHIPPER waive all right and remedies specified in 49 U.S.C. Subtitle IV, Part B, except for

KENNY NACHWALTER, P.A.

provisions governing registration, insurance and safety fitness. CARRIER and SHIPPER further expressly and irrevocably waive their respective rights to challenging the foregoing waiver or rights and remedies.

As a result, the STS has no regulatory authority over any aspect of Plaintiffs' contracts with Defendants and/or their co-conspirators, including the rates, surcharges, and any other fees set forth in Plaintiffs' contracts, even if those rates and surcharges are also incorporated into a tariff. Section 14101(b)(2) of the ICCTA directs that Plaintiffs' remedy for the injuries suffered by Plaintiffs as a result of Defendants' and their co-conspirators' conspiracy is an action in Federal Court.

13.   Horizon Lines – one of Defendants' admitted co-conspirators – has repeatedly stated in its securities filings with the U.S. Securities and Exchange Commission that the confidential contracts used on the Puerto Rico trade are exempt from STB regulation and, therefore, the filed rate doctrine could not possibly apply.   Horizon's May 19, 2006 S-I Registration Statement provided, "Our rates in the Puerto Rico and Alaska markets are predominantly contained in negotiated transportation service contracts which are exempt from STB rate regulation." Horizon Lines May 19, 2006 S-1 Registration Statement at 103.  Horizon's 13 2007 10-K also stated, "[I]n the case of our Puerto Rico and Alaska trade routes, we primarily ship containers on the basis of confidential negotiated transportation service contracts that are not subject to rate regulation by the STB."

<u>**Defendants**</u>

14.   Defendant Sea Star Line, LLC ("Sea Star Line") is a Delaware limited liability company with its principal place of business in Jacksonville, Florida. Sea Star Line is privately owned and managed by TOTE, Inc. (f/k/a American Shipping Group, Inc., which is wholly-owned by Defendant Saltchuk Resources, Inc., and Taino Star, Inc.   Before 2005, Saltchuk Resources, Inc. directly owned Sea Star Line. During time periods relevant to these allegations,

Sea Star Line, by itself, through and/or on behalf of Saltchuk Resources, Inc., engaged in anticompetitive conduct as alleged in this Complaint which proximately caused injury and damages to Plaintiffs in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15.    Defendant Saltchuk Resources, Inc. ("Saltchuk") is a Washington corporation with its principal place of business in Seattle, Washington.  Saltchuk is a privately held holding company that directly owned Sea Star Line prior to 2005, and continues to maintain its ninety percent (90%) ownership interest in Sea Star Line through its wholly-owned subsidiary, TOTE, Inc. (f/k/a American Shipping Group, Inc.).  During time periods relevant to these allegations, Saltchuk, by itself or through or on behalf of Sea Star Line, engaged in anticompetitive conduct as alleged in this Complaint which proximately caused injury and damages to Plaintiffs in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16.    Defendants Sea Star Line and Saltchuk are collectively referred to in this Complaint as "Sea Star" or "Defendants."  Sea Star participated in the conspiracy alleged in this Complaint throughout the duration of the conspiracy.

17.    Defendants were each members of the conspiracy alleged in this Complaint because, among other reasons, each of them participated in the conspiracy through the actions of their respective officers, employees and representatives, including, without limitation, Leonard Shapiro, a founder and principal of Saltchuk; Mark Tabbutt, who is currently the Chairman of Saltchuk; Bob Magee, who served as President and CEO of Saltchuk's wholly-owned subsidiary TOTE, Inc. and Chairman of Sea Star Line; Frank Peake, who served as President and COO of Sea Star Line; Peter Baci, who served as Senior Vice President/Yield Management of Sea Star Line; Alexander Chisholm, who served as Assistant Vice President/Yield Management of Sea Star Line; and Phil Bates, who served as Senior Vice President/International Services of Sea Star Line.  Each of the foregoing individuals who

KENNY NACHWALTER, P.A.

participated in the conspiracy did so during the course and scope of their employment with Defendants.

18.     Alternatively, Saltchuk was a member of the conspiracy alleged in this Complaint because of, among other reasons, its status during time periods relevant to these allegations, including during the conspiracy alleged in this Complaint, as the alter ego of Sea Star Line as evidenced by, among other things, Saltchuk's domination or control over the business decisions and actions of Sea Star Line, including, without limitation: the prices at which Sea Star Line sold Puerto Rican Cabotage services; major operational decisions, such as whether to operate certain vessels and how to schedule sailings; the hiring and firing of officers or members of the Board of Directors at Sea Star Line; the budgets for Sea Star Line; the capitalization of and/or loans to Sea Star Line; the transfer of officers or employees between Sea Star Line and Saltchuk; the marketing, advertising or branding of/for Sea Star; and/or the business plan or day-to-day operations of Sea Star Line.  Examples showing Saltchuk's domination or control over Sea Star Line are also detailed in Paragraph 6(f) above.  The foregoing specific allegations reveal that during times relevant to these allegations, Saltchuk dominated or controlled Sea Star Line with respect to conspiracy activities as alleged below, and Saltchuk used that domination or control over Sea Star Line to unlawfully charge Plaintiffs and others artificially higher prices for Puerto Rican Cabotage services which proximately caused injury and damages to Plaintiffs and others.

### CO-CONSPIRATORS

19.     Other people and entities not named as Defendants in this Complaint combined or conspired with Defendants and committed acts in furtherance of the illegal conspiracy set forth in this Complaint, including, without limitation, Horizon Lines, LLC (f/k/a CSX Lines, LLC) ("Horizon"), Crowley Liner Services, Inc. and Crowley Maritime Corporation (collectively

"Crowley"), Peter Baci, Frank Peake, Leonard Shapiro, Mark Tabbutt, Bob Magee, Alexander G. Chisholm, Phil Bates, Gabriel Serra, Kevin Gill, and Gregory Glova. Plaintiffs reserve the right to amend this Complaint to add other Defendants or allegations based upon further information and discovery in the case.

## **PRODUCT**

20.     As used in this Complaint, "Puerto Rican Cabotage" means ocean freight services between the United States and Puerto Rico, which is also sometimes referred to as Puerto Rico freight services or coastal water freight shipments.  The reference in this Complaint to "Puerto Rican Cabotage" includes both shipping from the Continental United States to Puerto Rico, and shipping from Puerto Rico to the Continental United States.

21.     During time periods relevant to the allegations in this Complaint, pricing for Puerto Rican Cabotage services included a base rate plus various additional surcharges for items or services, including, without limitation, bunker fuel, port security and intermodal transport.  Both base rates and any additional surcharges imposed by Defendants and their co-conspirators are within the scope of Plaintiffs' claims as alleged in this Complaint.

22.     The market for Puerto Rican Cabotage services is concentrated, and during time periods relevant to the allegations in this Complaint, the market was dominated by Defendants and their co-conspirators, who collectively had a market share of more than approximately 85%.

23.     Puerto Rican Cabotage is a commodity service, or possesses commodity-like characteristics, because Defendants and their co-conspirators offer essentially the same service: transportation of cargo from a specific origin to a destination within a certain time frame.

24.     During time periods relevant to the allegations in this Complaint, there were barriers to entry with respect to the Puerto Rican Cabotage market, including, without

limitation, the Merchant Marine Act of 1920, 46 U.S.C. § 100, *et seq.*, which is commonly referred to as the Jones Act. The Jones Act grants an exclusive privilege to certain United States-flagged vessels to engage in ocean shipping of goods to or from United States territories, including Puerto Rico. The law prohibits all other vessels, such as foreign-flagged, foreign-built, foreign-crewed, or even foreign-refurbished vessels from engaging in this trade. The Jones Act does not allow carriers subject to the Act to engage in the kind of anticompetitive conduct alleged in this Complaint.

25.     There are no viable economic substitutes for Puerto Rican Cabotage services. Shipping goods via air freight is prohibitively expensive, and there are obviously no road or rail routes between Puerto Rico and the Continental United States.

### TRADE AND COMMERCE

26.     During time periods relevant to the allegations in this Complaint, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate commerce, and the effect of that business on interstate commerce is substantial. In particular, the activities of Defendants are within the flow of interstate commerce or have a substantial effect upon interstate commerce in that:

A.     Defendants sold Puerto Rican Cabotage services to customers throughout the United States, and shipped substantial quantities of goods in a continuous and uninterrupted flow in interstate commerce between the Continental United States and Puerto Rico;

B.     Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States; and

KENNY NACHWALTER, P.A.

C.     Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States.

## GOVERNMENT INVESTIGATIONS AND CRIMINAL PROCEEDINGS

27.     This section contains allegations regarding companies and people who have thus far pled guilty to participating in a conspiracy not to compete on Puerto Rican Cabotage Services.  The guilty pleas to date do not define the full scope of the conspiracy, nor do they identify all of its participants.  Rather, by operation of law, the guilty pleas merely define the minimum parameters of the cartel.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.2d 651, 664 (7th Cir. 2002); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 607 (N.D. Cal. 2010); *In re Vitamins Antitrust Litig.*, 2000 WL 1475705, at *11 (D.D.C. May 9, 2000).  Moreover, as alleged in this Complaint, other companies and people besides those who have thus far pled guilty participated in the conspiracy.

### Sea Star Line

28.     On December 19, 2011, Defendant Sea Star Line agreed to plead guilty, and did plead guilty, to "participat[ing] in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing the rates and surcharges charged to customers for Puerto Rico freight services."  In its plea agreement, Sea Star Line admitted that "[i]n furtherance of the conspiracy, [Sea Star Line], through certain of its officers and employees, engaged in discussions and attended meetings with representatives of other providers of Puerto Rico freight services.  During these discussions and meetings, agreements were reached to fix the rates and surcharges to be charged to customers for Puerto Rico freight services."

KENNY NACHWALTER, P.A.

**Peter Baci**

29.     On October 20, 2008, co-conspirator Peter Baci of Sea Star agreed to plead guilty, and on January 21, 2009 did plead guilty, to "participating in a conspiracy to suppress and eliminate competition in the market for coastal water freight shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May 2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." Between at least April 2002 and April 2008, Mr. Baci served as Senior Vice President of Yield Management at Sea Star, and was responsible for Sea Star's pricing and marketing of Puerto Rican Cabotage services. A Federal Court sentenced Mr. Baci to 48 months in prison for his felony acts.

30.     As set forth in his plea agreement, Mr. Baci "participated in a conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition." During the relevant period, Mr. Baci "committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services. During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers...."

**Alexander Chisholm**

31.     On October 20, 2008, co-conspirator Alexander Chisholm of Sea Star agreed to plead guilty, and on January 23, 2009, did plead guilty, to an Information relating to the Puerto Rican Cabotage conspiracy charging him with "corruptly altering, destroying and concealing

records and documents and attempting to do so with the intent to impair the availability of the records and documents for use in a federal grand jury investigation, in violation of 18 U.S.C. § 1512(c)(1)." Between at least April 2002 and April 2008, Mr. Chisholm served as the Assistant Vice President of Yield Management for Sea Star, and was responsible for Sea Star's pricing and marketing of Puerto Rican Cabotage services. A Federal Court sentenced Mr. Chisholm to 7 months in prison for his felony acts. During and as part of the conspiracy alleged in this Complaint, Mr. Chisholm received pricing information about Sea Star's competitors from Mr. Baci, who was in direct communication with his counterparts at Horizon and other co-conspirators in furtherance of the cartel.

**Horizon Lines**

32.     On March 15, 2011, co-conspirator Horizon Lines agreed to plead guilty, and on March 22, 2011, did plead guilty, to "participat[ing] in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing the rates and surcharges charged to customers for Puerto Rico freight services." In its plea agreement, Horizon Lines admitted that "[i]n furtherance of the conspiracy, [Horizon Lines], through certain of its officers and employees, engaged in discussions and attended meetings with representatives of other providers of Puerto Rico freight services. During these discussions and meetings, agreements were reached to fix the rates and surcharges to be charged to customers for Puerto Rico freight services."

**Gabriel Serra**

33.     On October 20, 2008, co-conspirator Gabriel Serra of Horizon agreed to plead guilty, and on January 23, 2009, did plead guilty, to "participating in a conspiracy to suppress and eliminate competition in the market for coastal water freight shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to

KENNY NACHWALTER, P.A.

government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May 2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." Between at least April 2002 and April 2008, Mr. Serra served as the Senior Vice President and General Manager for the Puerto Rico division of Horizon and was responsible for Horizon's pricing and marketing of Puerto Rican Cabotage services.   A Federal Court sentenced Mr. Serra to a term of 34 months of imprisonment for his felony acts.

34.   As set forth in his plea agreement, Mr. Serra "participated in a conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition." During the relevant period, Mr. Serra "committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services.   During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers...."

### Kevin Gill

35.   On October 20, 2008, co-conspirator Kevin Gill of Horizon agreed to plead guilty, and on January 23, 2009, did plead guilty, to "participating in a conspiracy to suppress and eliminate competition in the market for coastal water freight shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May 2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." From at least April 2002 until

December 2005, Mr. Gill served as the Marketing and Pricing Director for the Puerto Rico division of Horizon and from December 2005 until at least April 2008, Mr. Gill served as Horizon's Vice President of Marketing.  From at least April 2002 until at least April 2008, Mr. Gill was responsible for pricing and marketing of Puerto Rican Cabotage services.  A Federal Court sentenced Mr. Gill to a term of 29 months of imprisonment for his felony acts.

36.     As set forth in his plea agreement, Mr. Gill "participated in a conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition."  During the relevant period, Mr. Gill "committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services.  During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers...."

**Gregory Glova**

37.     On October 20, 2008, co-conspirator Gregory Glova of Horizon agreed to plead guilty, and on January 23, 2009 did plead guilty, to "participating in a conspiracy to suppress and eliminate competition in the market for coastal water freight shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May 2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."  From December 2005 until at least April 2008, Mr. Glova served as the Marketing and Pricing Director for the Puerto Rico division of Horizon and was responsible for pricing and marketing of Puerto Rican Cabotage

KENNY NACHWALTER, P.A.

services.  A Federal Court sentenced Mr. Glova to a term of 20 months of imprisonment for his felony acts.

38.     As set forth in his plea agreement, Mr. Glova "participated in a conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition."  During the relevant period, Mr. Glova "committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services.  During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers...."

**Crowley Liner Services**

39.     On July 31, 2012, co-conspirator Crowley Liner Services agreed to plead guilty, and did plead guilty to "participat[ing] in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing the rates and surcharges charged to non-government customers in particular contracts for Puerto Rico freight services."  In its plea agreement, Crowley Liner Services admitted that "[i]n furtherance of the conspiracy, [Crowley Liner Services], through at least one of its officers, engaged in discussions and attended meetings with representatives of other providers of Puerto Rico freight services.  During these discussion and meetings, agreements were reached to fix the base rates to be charged to non-government customers in particular contracts for certain Puerto Rico freight services."

KENNY NACHWALTER, P.A.

## TOLLING OF THE STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

40.     The statutes of limitation as to Defendants' continuing antitrust violations were tolled, among other reasons, because of each of the following allegations, which may be read together or in the alternative:

A.     Class actions were filed against Defendants based on conduct alleged in this Complaint.   The pendency of those class actions tolled the running of the statute of limitations as to Plaintiffs;

B.     The U.S. Department of Justice instituted criminal proceedings based on conduct alleged in this Complaint which tolls the running of the statute of limitations as to Plaintiffs.  *See* 15 U.S.C. § 16(i).  Indeed, 15 U.S.C. § 16(i) tolled the statute of limitations on Plaintiffs' claims until the date of filing this Complaint because the Department of Justice's criminal proceedings regarding Defendants' and their co-conspirators' conspiracy are ongoing; and

C.     Defendants' fraudulent concealment as alleged above and below tolled the statute of limitations.

41.     During time periods relevant to the allegations in this Complaint, each Plaintiff used a method of purchasing Puerto Rican Cabotage services that caused it to believe in good faith at the time that it was receiving competitive prices for Puerto Rican Cabotage services that it purchased directly from one or more Defendants and their co-conspirators.  Unfortunately, as alleged in this Complaint, as a proximate result of the conspiracy, Defendants and their co-conspirators overcharged Plaintiffs for Puerto Rican Cabotage services during time periods relevant to Plaintiffs' antitrust claims despite their due diligence.

42.     Defendants' and their co-conspirators' conspiracy was self-concealing, which prevented Plaintiffs from discovering its existence more than four (4) years before filing a

KENNY NACHWALTER, P.A.

lawsuit. Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiffs by, without limitation, one or more of the following affirmative acts:

A.    Destroying documents which would reflect an antitrust violation or anticompetitive act (*e.g.*, destroying documents during the conspiracy; Mr. Chisholm of Sea Star initially destroyed a computer hard drive containing incriminating documents);

B.    Creating anonymous Google mail accounts such as "AnnClark@gmail.com" and "lighthouse123@gmail.com" to avoid detection from others while sending and receiving e-mail communications between competitors about the conspiracy;

C.    Providing Plaintiffs with false or misleading explanations for the increase in prices for Puerto Rican Cabotage services so as to create the illusion that such changes in price were the result of unilateral conduct when, in fact, they were the product of collusion;

D.    Issuing price announcements for Puerto Rican Cabotage services so as to create the illusion of competitive pricing in the industry when, in fact, the pricing was not competitive;

E.    Instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy;

F.    Confining the anticompetitive, unlawful plan to a limited number of people and key officials at each Defendant company;

G.    Avoiding either references in documents or the creation of documents otherwise generated in the ordinary course of Defendants' businesses regarding conduct which would constitute an antitrust violation or anticompetitive act;

KENNY NACHWALTER, P.A.

H.      Using misleading filenames for electronic documents, such as "market analysis" or "barge analysis" to conceal that they contained pricing information obtained from competitors;

I.      Conducting conspiracy communications over disposable cell phones to avoid detection from others while having telephone communications about the conspiracy;

J.      Conducting covert, secret conspiracy communications or meetings in the United States; and/or

K.      Submitting prearranged, complementary losing bids on contracts for the sale of Puerto Rican Cabotage so as to create the illusion of competition when, in fact, the bids were not competitive.

43.      Each Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon more than 4 years before filing a lawsuit, or before the statute of limitations was tolled, because of the self-concealing character of the conspiracy and/or because of Defendants' and their co-conspirators' fraudulent concealment of the conspiracy as alleged above.

44.      Plaintiffs' claims have been brought within the applicable limitations period.

**OVERT ACTS**

45.      In furtherance of the antitrust violations alleged in this Complaint, Defendants and their co-conspirators engaged in overt acts, including those alleged with particularity above and below.  These overt acts included meetings and communications between or among Defendants and their co-conspirators at which they agreed on the terms of their conspiracy and/or discussed actions in furtherance of their conspiracy.

46.      In 2001, Navieras NPR ("Navieras") was one of the largest participants in the Puerto Rican Cabotage market.  That year, Sea Star purchased Navieras' assets, which included

KENNY NACHWALTER, P.A.

five (5) containerships, for approximately $32 million. At the time, prices for Puerto Rican Cabotage services were low. Thereafter, Defendants and their co-conspirators decided to enter into an agreement not to compete on Puerto Rican Cabotage services in order to increase prices.

47.     Following discussions between or among Defendants, an initial meeting was held to kick off the cartel. This conspiracy meeting occurred on or about April 24, 2002 at the Park Hotel in Charlotte, North Carolina and was attended by Leonard Shapiro of Saltchuk; Peter Baci and Phil Bates of Sea Star Line; and Gabriel Serra, R. Kevin Gill, Jim McKenna and Neil Perlmutter of Horizon. This meeting is referred to as the "Park Hotel" meeting. At the time of this conspiracy meeting, Mr. Baci was reporting directly to Mr. Shapiro, and Mr. Shapiro was responsible for Sea Star's pricing for Puerto Rican Cabotage services. Both before and after the Park Hotel meeting, Mr. Shapiro regularly visited Sea Star Line's offices to discuss with Mr. Baci plans to increase Sea Star Line's rates for Puerto Rican Cabotage Services.

48.     At the Park Hotel meeting, as part of the conspiracy, Sea Star and Horizon unlawfully agreed to limit the number of sailings between the Continental United States and Puerto Rico, and for Sea Star not to operate any of the containerships that it had purchased from Navieras. This unlawful agreement constituted a classic capacity (or supply) restraint.

49.     As part of Sea Star's unlawful participation in the conspiracy, Horizon unlawfully agreed to give Sea Star preferred pricing for a specified number of allocated container slots on Horizon's containerships sailing to Puerto Rico from Port Elizabeth, New Jersey, Jacksonville, Florida and Houston, Texas.

50.     Jim McKenna of Horizon took notes of the discussion among those attending the Park Hotel conspiracy meeting. Mr. Gill was instructed to destroy his copy of Mr. McKenna's

KENNY NACHWALTER, P.A.

notes because they were incriminating and to conceal Defendants' and their co-conspirators' unlawful conduct.

51.     In accordance with the unlawful agreement reached at the Park Hotel meeting in April 2002, Sea Star did not operate the five containerships that it had acquired from Navieras. This capacity constraint had the intended effect of artificially stabilizing, maintaining and/or increasing prices of Puerto Rican Cabotage services.

52.     After Sea Star and Horizon reached their agreement to restrain capacity as described above, the conspiracy not to compete alleged in this Complaint was carried out by Defendants and their co-conspirators through unlawful collusion among Sea Star, Horizon, and their co-conspirators to divide market shares, rig bids, fix rates and surcharges, and/or allocate specific customers.  Among the people who participated in these unlawful discussions were: Peter Baci, Alexander Chisholm and Frank Peake for Sea Star Line; Leonard Shapiro of Saltchuk; and Gabriel Serra, R. Kevin Gill, Gregory Glova and Charles Raymond for Horizon. Communications as part of the conspiracy included, for example, the following:

A.     In or about September or October 2002, Messrs. Baci of Sea Star and Gill of Horizon met at a Horizon corporate apartment in Charlotte, North Carolina.  At this meeting, Messrs. Gill and Baci unlawfully discussed implementing price increases at customers whose contracts were going to expire in the near term;

B.     In May 2003, Mr. Raymond of Horizon met with a co-conspirator from another company and they unlawfully discussed pricing for Puerto Rican Cabotage services to specific customers, including Plaintiff Del Monte. Mr. Gill of Horizon prepared a list of customers for the discussion at Mr. Raymond's request in advance of the meeting;

C.     On June 26, 2003, Mr. Shapiro of Saltchuk and Mr. Serra of Horizon met in Dallas, Texas, and they agreed to a 50/50 allocation of containership volume between Sea

Star and Horizon.  At this meeting, Messrs. Shapiro and Serra also confirmed that Sea Star and Horizon would not compete for customers on the basis of price.  After the 50/50 allocation agreement was reached in Dallas, Mr. Shapiro tasked Mr. Baci with implementing the agreement for Sea Star, and Mr. Serra tasked Mr. Gill with implementing the agreement in Florida;

        D.     On December 11, 2003, Mr. Raymond of Horizon sent a handwritten note to Messrs. Gill and Serra, among others at Horizon informing them that he had a discussion with "the Saltchuk folks" about Mr. Shapiro joining the board of Saltchuk, in which Mr. Raymond was reassured that Mr. Shapiro's move "ha[d] no impact whatsoever on [Saltchuk's] corporate pricing philosophy."  Mr. Raymond's note instructed its recipients to "please read and destroy;"

        E.     In 2004, Mr. Baci of Sea Star had unlawful discussions with Mr. Gill of Horizon and a co-conspirator from another company regarding the implementation and amount of an "intermodal" surcharge on the cost of fuel to transport cargo on land to a given port.  As a result of these discussions, Sea Star, Horizon and the co-conspirator all instituted intermodal fuel surcharges for their customers;

        F.     On or about August 10, 2005, Mr. Gill of Horizon and a co-conspirator from another company unlawfully discussed future price increases for Puerto Rican Cabotage Services, including a strategy to implement a $300 per container price increase on refrigerated cargo;

        G.     In January 2006, Mr. Baci of Sea Star met Messrs. Gill and Glova of Horizon at the Lodge Alley Inn in Charleston, South Carolina.  The purpose of the meeting was to introduce Mr. Glova – who was taking over Mr. Gill's position – to Mr. Baci.  After this meeting, Mr. Glova also became Mr. Baci's primary conspiracy contact at Horizon.  At this

meeting, Messrs. Baci, Gill, and Glova unlawfully discussed surcharge amounts and the allocation of specific customers;

H.      In August 2006, Messrs. Peake and Baci of Sea Star met with Messrs. Serra and Glova of Horizon in Orlando, Florida, where they unlawfully discussed their agreement to split containership volume between Sea Star and Horizon on a 50/50 basis;

I.      On or about October 23, 2006, Messrs. Peake and Baci of Sea Star met with Messrs. Serra and Glova of Horizon in Orlando, Florida and unlawfully discussed pricing for Puerto Rican Cabotage services to specific customers;

J.      In June 2007, Gabriel Serra of Horizon and a co-conspirator from another company had lunch at Gaucho's Restaurant in San Juan, Puerto Rico. At this meeting, Serra and the co-conspirator unlawfully discussed a coordinated strategy for following increases in rates and fuel surcharges led by Defendants and maintaining a relatively fixed "spread" in rates for Puerto Rican Cabotage among Defendants and their co-conspirators;

K.      In November 2007, Mr. Glova of Horizon and a co-conspirator from another company exchanged emails containing pricing information for specific customers, and unlawfully discussed what each company going to bid for the customers' business for the purpose of collusively allocating the customers' business as part of the cartel;

L.      In both 2007 and 2008, Plaintiff Walgreen held an online auction to award its Puerto Rican Cabotage business. During these auctions, Messrs. Baci and Chisholm of Sea Star, Mr. Glova of Horizon, and a co-conspirator from another company unlawfully exchanged information about their bidding strategies via telephone in order to submit pre-arranged complementary bids to ensure that, despite the auction, Walgreen would receive an artificially high price;

KENNY NACHWALTER, P.A.

M.     On April 1, 2008, Gabriel Serra of Horizon met with a co-conspirator from another company in Orlando, Florida and unlawfully discussed pricing of Puerto Rican Cabotage services to specific customers and maintaining the companies' respective market shares;

N.     During the conspiracy, Sea Star, Horizon, and their co-conspirators maintained customer lists which they unlawfully used to fix prices and allocate volumes of Puerto Rican Cabotage services for particular customers.  Plaintiffs were identified on those lists.  Often, Sea Star, Horizon, and their co-conspirators would fix prices regarding one of the larger customers on the list or within an industry sector, and then use that understanding as a basis to price Puerto Rican Cabotage services collusively to other customers on the list (including at times one or more Plaintiffs) even if they did not expressly mention that customer by name in a conspiracy meeting.  For example, Sea Star maintained customer lists of its top (approximately) 150 accounts which it called its "Hall of Fame" accounts.  Sea Star used its Hall of Fame account lists to collude with other Defendants and co-conspirators in fixing prices or allocating business of customers.  Not making Sea Star's "Hall of Fame" account list did not protect a Sea Star customer from the reach or effect of the cartel.  Sea Star, Horizon and their co-conspirators fixed prices and allocated Puerto Rican Cabotage business of customers who were not on a Sea Star "Hall of Fame" account list; and

O.     During the conspiracy, Defendants would also prepare lists of customers whose contracts were soon to expire in order to focus their upcoming discussions on unlawfully coordinating those customers' pricing in their new contracts.  Plaintiffs were on those lists.  For example, on or about August 17, 2007, Mr. Baci of Sea Star sent Mr. Glova of Horizon a list of customers whose contracts were soon to expire that included Plaintiffs Unilever, Del Monte and Ingersoll-Rand.

KENNY NACHWALTER, P.A.

## ANTITRUST VIOLATION

### Combination or Conspiracy in Restraint of Trade (15 U.S.C. § 1)

53.     Plaintiffs incorporate by reference as if alleged in this Count the allegations in paragraphs 1 to 52 above.

54.     Beginning at least as early as April 2002, and continuing until at least April 2008, with an impact that may have lasted longer, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Puerto Rican Cabotage services in unreasonable restraint of trade and commerce in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

55.     The contract, combination and conspiracy among Defendants and their co-conspirators described in the immediately preceding paragraph consisted of a continuing course, pattern and practice of conduct regarding the supply or capacity to provide, and the pricing and sale of Puerto Rican Cabotage services to Plaintiffs and others in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

56.     The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were:

A.     To fix, stabilize, maintain and/or raise prices for Puerto Rican Cabotage services sold to Plaintiffs and others;

B.     To allocate the volume of sales and/or market shares for Puerto Rican Cabotage services;

C.     To allocate contracts and/or customers, including Plaintiffs and others, for Puerto Rican Cabotage services; and

KENNY NACHWALTER, P.A.

D.      To control or reduce the output of and/or capacity for Puerto Rican Cabotage services.

57.     In order to formulate and put into effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts:

A.      They agreed to exchange and did exchange current and future price information about Puerto Rican Cabotage services, including current and future price information for specific customers such as Plaintiffs;

B.      They agreed to coordinate and did coordinate price levels and price movements for Puerto Rican Cabotage services sold to Plaintiffs including, without limitation, rigging bids for Puerto Rican Cabotage services to Plaintiffs;

C.      They agreed on prices and price levels for Puerto Rican Cabotage services sold to Plaintiffs and others;

D.      They agreed to fix, stabilize, maintain and/or increase, and fixed, stabilized, maintained and/or increased, price and price levels of Puerto Rican Cabotage services in relation to each other;

E.      They agreed to allocate and allocated among themselves Puerto Rican Cabotage customers, including Plaintiffs, and/or sales volume of Puerto Rican Cabotage services;

F.      They agreed to allocate and allocated among themselves market shares for Puerto Rican Cabotage services; and/or

G.      They agreed to control or reduce, and did control or reduce, the supply of, and/or the capacity to provide, Puerto Rican Cabotage services.

KENNY NACHWALTER, P.A.

58.     Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other acts, those overt acts alleged with particularity above, including, without limitation, participating in conversations and attending meetings concerning the implementation of and adherence to the conspiracy; issuing price announcements and price quotations in accordance with the conspiracy; monitoring compliance with the conspiracy; and/or exchanging between or among themselves information on the sale of Puerto Rican Cabotage services.

59.     As a result of Defendants' and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during times relevant to the allegations in this Complaint:

A.     Price competition in the sale of Puerto Rican Cabotage services among Defendants and their co-conspirators to Plaintiffs, and others has been restrained, suppressed and eliminated;

B.     Prices for Puerto Rican Cabotage services sold by Defendants and their co-conspirators to Plaintiffs, and others have been raised, fixed, maintained and/or stabilized at artificially high and non-competitive levels; and

C.     Plaintiffs, and other direct purchasers of Puerto Rican Cabotage services from Defendants and their co-conspirators, have been deprived of the benefit of free and open competition.

60.     Plaintiffs have been injured in their business or property by reason of Defendants' and their co-conspirators' antitrust violations in amounts not yet ascertained. Plaintiffs' injuries as direct purchasers of Puerto Rican Cabotage services from Defendants and their co-conspirators are of the type that the antitrust laws were designed to prevent and flow from that which makes Defendants' and their co-conspirators' acts unlawful.

KENNY NACHWALTER, P.A.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.      A jury verdict in the amount of the compensatory damages sustained by Plaintiffs;

2.      A judgment against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorney's fees, costs and interest as allowable by law; and

3.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable by right to a jury.

Dated:  October 29, 2012                          Respectfully submitted,

_____
Kevin J. Murray, Esq.
Florida Bar No. 290602
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard
Suite 1100
Miami, Florida  33131
Tel:     (305) 373-1000
Fax:     (305) 372-1861
E-mail:  kmurray@knpa.com

William J. Blechman, Esq. (admission application pending)
Florida Bar No. 379281
James Almon, Esq. (admission application pending)
Florida Bar No. 0017173
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard
Suite 1100
Miami, Florida 33131
Tel:     (305) 373-1000
Fax:     (305) 372-1861
E-mail:  wblechman@knpa.com
         jalmon@knpa.com

440053.1

KENNY NACHWALTER, P.A.